Good morning. May it please the court. Ron Chaudhary on behalf of Appellant Ralph Taylor. Your honors, as this court has set out, and I don't think it's controversial, the test as to whether a person is in custody, as this court set out in Kim and Craighead, comes down to whether a reasonable person in the suspect situation would have felt free to terminate the interrogation and leave. And here we have the somewhat unusual fact situation that Mr. Taylor, in fact, tried to leave and he was prevented from leaving. Officer Arantia tapped him on the shoulder, and these facts are not in dispute. These are the facts taken from the declarations and the testimony at the motion to suppress. Well, but that seemed like there was a... when he tried to leave, there were two versions of what happened. Your client, Mr. Taylor, said that the officer grabbed him by the shoulder and by the arm, I guess, and didn't let him go. The officer, I think it was either the statement, testimony, I don't remember, said he tapped him on the shoulder. Your honor, I think there was some confusion in terms of the argument blow, but in terms of the facts and the record, in terms of the declaration, there was a statement from Agent Arantia, and in Agent Arantia's declaration and in his testimony, that Agent Arantia was the agent who prevented Mr. Taylor from leaving. He tried... and that's at ER 45, ER 51, that's the testimony from Agent Arantia, and ER 103 is the declaration. He very clearly says, Mr. Taylor attempted to walk out of the apartment. Agent Arantia taps him on the shoulder, and the tried to walk out the door. I told him, hey, come back in at ER 51. Ralph, you know, come back inside, let me see the keys, and come back inside. He testified at ER 46 that he ordered Mr... that he agreed that he that he had asked Mr. Taylor to come back inside, and that Mr. Taylor complied with his directive. The second incident that your honor is referring to is something that happened almost immediately after that, where Agent Mandoli is then talking to Mr. Taylor about a key for the second bedroom, and the testimony there is clear in terms of what Agent Mandoli stated in his declaration and stated at the motion to suppress hearing. Mr. Taylor moved to the kitchen, and at that point, Agent Mandoli seized him by the arm. It was physically restrained, Mr. Taylor, by the arm. Agent Mandoli says there were safety reasons, officer safety reasons for doing this, but our point is, and the argument below on the motion to suppress was, that at the very latest, at the time that Mr. Taylor is seized by the arm by Agent Mandoli, a reasonable person in those circumstances would have felt in custody. And I think it might help, your honor, just to clarify the chronology, because I know that  5 o'clock, five agents from Homeland Security Investigations appeared at Mr. Taylor's home. There was a little bit of a discussion, a colloquy at the door, then they come in. They're initially there to interrogate him about this money order counterfeiting scheme. That goes from about 5 to 6 55 p.m. Now to be clear, the testimony was clear at the motion to suppress that no one ever told Mr. Taylor he was free to leave. That's an important fact. In fact, there was a council, and I believe it was Agent Orantia, question, you did not tell him he could leave, right? Answer, no I did not tell him he could leave. None of us told him he could leave. He never asked to leave, question, other than when he walked outside and tried to leave. Answer, exactly. That's ER 46. So up until 6 55 p.m. there's this discussion, there's a search of the first bedroom, then the agents are talking about leaving. That's when there's a discussion about keys to the second bedroom. They confiscated his car keys after he left, after he attempted to leave the apartment. So Agent Orantia, the testimony is, again that's at ER 45, ER 51, and 103, that Mr. Taylor around 6 55 p.m. attempts to leave because he's apparently feeling nervous or doesn't like the situation. Agent the testimony is clear that Mr. Taylor comes back and gives Mr. Orantia his car keys, Agent Orantia's car keys, and it's soon after that that there's a discussion about how do we open the second bedroom, and Mr. Taylor starts walking in his own apartment to go to his kitchen and is physically restrained. Now I put a lot of emphasis on those facts because as this court knows from Craighead and Kim, in those cases neither of those defendants was ever physically restrained. In those cases, the testimony was in Craighead that the defendant was told he was free to leave. There were other circumstances that led the court to conclude that Mr. Craighead was in custody. In Craighead, he was in the back of the house and there was officers blocking his way, so that quite didn't happen here, but I understand there were five officers here, they have the touching, and so the question was there sufficient restraint of his movement for him to, or their objective belief that he didn't feel like he could leave, right? Yes, Your Honor, and I think what's similar here is that as in Craighead, the home became a police-dominated atmosphere, and in Craighead, Your Honor's correct, there were eight officers, three agencies. Here, at the initial search, there were five officers. They invited in someone from the L.A. Port Police. They called LAPD, but they were too busy, they called, so then they called L.A. Port Police, so they invited someone else in to Mr. Taylor's apartment. Let me ask you, what effect did it have that he was on probation? There's some, there's a lot of reference to, or you know, threats, I don't know, I mean, we're gonna call your probation officer, he's on probation, or you know, some question whether, you know, this was going to be a probation search, and you know, when they sound like they threatened him again later with the probation search, what are we to do with that? Does that affect this in one way or another? Your Honor, I think that's important in terms of the officers went in there knowing that he had prior felonies, so at the time that they're going into the second bedroom and doing that search, they come out with the ammunition. That's clear on the record. They come with the ammunition. We're asking about the ammunition. They're asking him questions about incriminating activity. I don't think anyone's going to argue that that's not interrogation, and they know that they've stopped him from leaving his own apartment. They've taken away his car keys. They've physically restrained him in the house, in his own apartment. I think in those situations, we're looking at the totality of the circumstances, a reasonable person wouldn't felt free to leave. I think it's useful to look at Crawford, which is this court put a lot of emphasis on the fact that the defendant was repeatedly told he was free to leave, and in fact went home, and I think that's one of the most significant factors here, is that this sense of a reasonable person wouldn't felt free to leave, he was in fact arrested at the end of all of this. That's not the case in Craighead. Craighead was left alone, and the officers departed. He was not arrested. That's not the case in Kim. In Kim, at the end of the interrogation, she wasn't arrested. Also, the length here of the interrogation was much longer than in Craighead or Kim. Craighead, it was 20 to 30 minutes in that room, and I agree there are some factors in Craighead that are different, but in looking at the totality here, we have a much longer interrogation. It starts at 5 o'clock. They're interrogating him about the counterfeiting. At 6.55, it becomes much more aggressive, and there's the restraints, and he's stopped from leaving, and he's ultimately arrested at 7.55 p.m. Let's assume that he's in custody, and so we have the finding of the evidence here. What's, I guess, let's say that, I guess it was the jacket, the ammunition, and then the rifle. Yes, right. Seemed to be the most the evidence, especially in light of the fact that there's other evidence in the room. Sure, Your Honor, and I appreciate that we were just discussing the Chapman standard here. Here, I think it's clear that it was not harmless beyond a reasonable doubt. I would point to the government's excerpts of record, page 16. They characterize the it's over and Mr. Taylor's own statements as direct admissions of the crime. Here, it's important to keep in mind there was no forensic evidence. There was no DNA evidence, no fingerprint evidence. There was no eyewitness testimony about Mr. Taylor being seen with a gun. What they had, and the most powerful, as this court has characterized a defendant's own words, admissions, is the most powerful and damaging. They have his picture on the nightstand, and then they have his medication in a file cabinet, you know, with some of this evidence. And so, I think we have a case directly on point that when there's medication nearby, that that seems to be highly powerful circumstantial evidence. Your Honor, I would agree that there's some circumstantial evidence, but I would point the court to the government's opening during trial and closing, the repeated statements about it's over, and the testimonial act of dropping his head showed that that was at the heart of the government's case, Mr. Taylor's own admission. Wasn't the statement it's over, wasn't that a voluntary statement? He saw the long rifle in the mattress and he said it's over. He blurted that out. That strikes me as being voluntary. Yes, Your Honor. I know that the government makes that argument, and our point there would be that was a result of police first about the money orders and counterfeiting, and then after the restraint, there is first questioning about the jackets that's taken out of the room. And this is done in series. First, they come out with the jacket and they say, is this yours? This is your jacket. Next, they come out with the ammunition. They bring it out to him. They present it to him. They say, is this yours? And I think one of the most important points here is Agent Orantia. In his own report, he states, Orantia confronted Taylor with the rifle. And that's at ER 110. That's attached to his declaration in opposition to the motion to suppress. Agent Orantia wrote that report. Agent Orantia characterizes it himself as confronting Mr. Taylor with the rifle. And I think that distinguishes this situation from a lot of the cases that the government cites. In Sherwood, how did you find me so quickly? That's a statement at the initial outset of an interaction. In the sequence of events, when do you think he should have been Mirandized? Your Honor, I think that, as we argued below, I think at a very minimum, once they've prevented him from leaving, they've taken away his car keys, they've made clear to him, and I think to any reasonable person in that situation, you're not going anywhere. First of all, they never tell him he's not under arrest. They never tell him he's free to leave. In fact, actions speak louder than words here. They stop him from leaving. This is a fact situation we don't see in these cases. He tries to leave, prevented from leaving by an armed officer. There's no argument from the government that the other officers were not armed. And if an armed officer is telling you not to leave, then takes away your key, and then you're restrained by another officer, I think at that point, he should have been Mirandized. If they were going to continue interrogating him, knowing he has the prior felonies, he's on probation with prior felonies, they're going in, they're interrogating him about ammunition they find, they're confronting him, in Agent Aranti's own term, with the rifle, I think he should have been Mirandized. Now, I know there's some references in the government's papers that these were reasonable officer actions, that they were taken for safety reasons. That's fine, and that can entirely be true, but as this court noted in Craighead, the fact that these precautions may be necessary to the success of a lawful search does not lessen their tendency to make a reasonable person believe he is in custody. That is to say, we don't quibble with Agent Mandoli seizing Mr. Taylor by the arm. We're not saying that was unreasonable. We're not quibbling with Agent Aranti asking Mr. Taylor to stay, but the test, as we said at the outside, boils down to whether a reasonable person, subject to those police practices, reasonable or not, would feel free to leave. Let's see if Judge Gould has any questions before... No. Okay, thank you. I'm sorry, I have one more. Okay, go ahead. Okay, the officers were, the original five officers were all armed, correct? That is our understanding. Now, the testimony... My question is to you, it appeared from the record that they did something with their arms. Did they unholster the firearms? Did they take them out? Do you know what happened with the firearms? Your Honor, from this record, it does not appear that anyone unholstered their firearms. And so I think that that's a relevant fact. But I think it's relevant that you have these five HSI agents. Agent Aranti had testified very clearly that he was armed. I don't think there was a presentation of, you know, a weapon taken out or anything like that. But I think of the totality of the circumstances, especially that he's prevented from leaving, that his car key was taken away, that he was physically restrained, and that he was arrested at the end. This goes beyond, I think, the totality of circumstances in Craighead and Kim, where both defendants were found in custody. And the length, I think all of the factors here make that clear. I think the statement is not spontaneous because it is a result of police questioning, unlike the other cases cited by the government where the statement comes either at the outset or is not a result of confrontation. And where an act, as was said in Innis, if an act is reasonably likely to elicit an incriminating response, that's the functional equivalent of interrogation. And where he's first presented with a jacket, then he's presented with the ammunition, and then finally he's presented with the rifle, confronted with the rifle in Agent Aranti's terms, that's an action that's reasonably likely to elicit an incriminating response. Thank you, Mr. Chaudhary. Thank you. And if I have any time, I'd like to reserve a minute. I don't know if I do. No more time to talk about that. You already gave your rebuttal anyway. Good morning, Your Honors, and may it please the Court. Adam Schleifer on behalf of the Plaintiff Appellee of the United States. If I might, I'd like to address a few record points to clarify some of the facts to start. So the client, excuse me, the defendant said nothing about whether he was in custody or anything else because the only evidence in the record at both the suppression hearing and at trial was the testimony of the agents, Arantia and Mandoli, as pertains to the custodial question. To take a step back and perhaps walk you through what happened and when, the officers arrived around 3 p.m. and they surveilled the home. At around 5 p.m., they see the defendant, Mr. Taylor, arrive in his Ford Ranger truck and park at his home. Around 5.30, once they've prepared, they go to the door and they knock. There's an exchange at that point about, hi, we're from HSI, we'd like to speak with you. He asks whether they have a warrant. They say they do not, but they ask him whether he's on probation. The reason for that is an independent Fourth Amendment issue under the Granberry Law about knowing that someone is on probation has nothing to do with this Fifth Amendment issue. They don't ask him, they tell him, they acknowledge that they know he's on probation. They do ask him, are you on probation? He says, no, I'm not. And then there's a second colloquy. There are two exchanges on that. He eventually says, yes, I'm on probation. And he says, and I don't want my neighbors knowing this or hearing you guys, so come on in. And he invites them into the home at that point. They're now in the home. It is after 5.30. The way it was written, and just clarifying, I don't know that it really matters, but it was like they seem to communicate, do you want us to call your probation officer? Yes, because there was, he disputed about whether or not he was on probation with search conditions. And so what's the, what do we make of this, the fact that he was on probation and they could have done a probationary search and, you know, yet they're there doing this? I'm not quite sure what to make of this, the fact that he was on probation. They sort of threatened him with doing a probationary search. I'm not quite sure why they didn't do a probationary search. Well, because he gave his consent. So probation, so there are two aspects of consent and probation, and it's really a separate issue, again, under the Fourth Amendment, which was what the defendant actually raised in his suppression brief. He made, to be clear, and we should speak about this, he entirely forfeited the argument he now raises on appeal by never raising it in his opening brief. The probation issue really is relevant to the Fourth Amendment question whether it's reasonable to search. People who are on probation with search conditions have been deemed for Fourth Amendment purposes to have consented ex ante to such searches. The only issue is whether officers have a probable cause to believe that the home they're visiting is, in fact, their home. So that is a question really oriented toward the Fourth Amendment issue. When he is told, you know, we do have the right to do a probation search, he says, well, just come on in. And that is consent. Are there not five officers right there waiting at the door? I mean, I don't know. Maybe you tell me if that's how I'm reading this. It seemed like there were a number of officers at the door. They knock. He comes forward, says, what's going on? They kind of reference this, we'd like to talk to you about this counterfeiting scheme. Is that right at that point? Do they tell him? Yes, to develop him as a source. And, in fact, they agree very quickly that the point is they'll do an initial interview, and they tell him and he agrees that they'll continue that interview the following morning, which, in fact, actually goes to one of the custodial factors in that, yes, he wasn't told you're free to leave, which would be sort of an odd thing to say as they're speaking in his living room. Mr. Taylor, you can leave the living room at any time. I mean, that's really a factor that highlights a bigger point here, which is Miranda in custody evolved and is most concerned with station house interrogation. And that's going in advance. I mean, because then was he really free to leave when he's trying to leave? He's kind of frustrated by what's going on here. And they say, no, you can't leave. So, absolutely. And so the record here, and this is to address what my colleague had originally said in response to the court's question, there was no restraint on him from leaving. And so the record is clear at ER 45 to 46 that Arantia testifies under initially the defendant's cross. It says, you told him to come back inside. And then Arantia says, no, I asked him to come back inside. And then he complied. And then they said, you did not tell him he could leave. No, I did not tell him. And as my colleague pointed out, none of us told him he could leave, but neither did he ask. Then later under the government's questioning at ER 51 to 52, he was asked, did you secure him by his arm? I did not secure him by his arm. Did anyone block his path? Nobody blocked his path. Now, what happened here? They said to him, and this is important to understand, they had already seen into one room because the defendant kicked down his own son's room after sort of lying and saying it was his room. In fact, it was his son's. So then they said, thank you, Mr. Taylor. We'll be seeing you tomorrow morning. They prepare to leave. And on their way out, as a veracity check, really, more than anything, they say, by the way, so knowing he had just lied, well, so then what is the second room? He says, it's locked. I don't have any keys. At which point, Group Supervisor Mandoli and Arantia point out, well, how did you get here? We saw you drive. What do you mean you don't have keys? His keys were not confiscated. That's a really important point. They were not confiscated as part of some you are not free to leave. They didn't let him go get his own key. They stopped him from getting his. After they said, when he said he was going to leave, they didn't let him leave. And I don't know how you're, we're supposed to look at this from an objective point of view. Is that correct? Yes. So let's talk about that. So they say, just to finish the narrative, he says, I don't have keys. They say, well, how did you get here? You don't have car keys. He then takes out his own keys and he drops them on the ground, at which point they're picked up. And then the discussion says, look, you have keys. He says, OK, I'll open this room. At that point, he alights to go to the kitchen. That's when Mandoli, the first time he's touched, Mandoli says, Ralph, you don't need to go to the kitchen. He's concerned about knives in the kitchen. Why don't you let us go get it? He says, OK, the key to the bedroom is in the kitchen. They get it. He consents to the opening of the door. So that's the sequence. Now, why is that not custody is really the point here. Well, why is that? I guess what's your best argument, though? By someone who's been stopped or, you know, just told they can't go to get their truck, even though they're going to their truck, and then later told you can't go into your kitchen. Why wouldn't that person feel like they're not free to leave? Well, he well, for a number of reasons. First, again, he was not prevented from going to his truck. He said, why don't you come back in? Why are you lying? And he and he took the keys. But let's assume he that's not what he says. And so that's right. We don't have any. I don't think the district court made any specific findings on these facts that we're talking about right now, because it seemed like they had two versions, you know, the defendant, the defendant's version and then the officers. There is no defendant's version. There's argument. He has no testimony. And the only fact he put in the record is our own declaration, excuse me, our own report, which would be hearsay as evidence. So there's literally no version. There is a brief that he argued here after he forfeited in the district court. But that's it. So now let's talk about the case law and why this is not custody. Okay, so we have Bassignani. And as Judge Gould, I'm sure as the court knows in Bassignani, a group of officers show up at an employee's desk in his office publicly, command him to come with them to a conference room in an embarrassing fashion. He's in there for considerably longer than he is in this case and confronted with extensive evidence against him and then told, and if you don't give us the keys to your car, we're going to break into it. And the court in Bassignani said, no custody. Now, let's look at Craighead, which, by the way, I should point out is only an exception to the general rule that being in your home is actually less custodial than being in the station house. But why did the court in Craighead find that there was or hold there was custody of that case? Well, as Bassignani itself emphasized and as the Second Circuit emphasized in FAUX, it's all because in that case, on a military base, 10 officers show up and unholster their weapons. They draw their firearms. They're wearing flak jackets. They bring someone to a storage shed in the back of the home, and they block the exit. That is far more martial and far more custodial than the circumstances in this case. Let's look at Cazares. In this, this court in Cazares held that 10 officers showing up at 7 in the morning, waking a guy up who had just gotten into bed from a double night shift, took him out of bed and said, you have two choices. You can come with us to the station house or we can drive you there. No custody. So that's why there's no custody. If I could, because I see I'm running out of time, let me just cover two other really important points. There is simply no question that the defendant never raised this argument whatsoever in his opening brief in the district court. He then raised it only generally and did not identify the ammunition statement in his reply, notwithstanding the government's identification of the same in his trial memo. When the court made its ruling in suppression, the defendant did not say, well, what about the ammunition? When Mandoli made the one fleeting reference to ammunition at trial, he did not object. Another witness took the stand. In the middle of that witness's testimony, there was an initial motion for mistrial. The court found that argument was waived. The court then doubled down and emphasized again waiver in its final motion denying mistrial. There was never a limiting instruction requested. So this is all under plain error review. Given the fact that the rifle is clearly admissible as a spontaneous statement, as Judge Christensen had indicated, then under either plain error or harmless error. I guess whether it's plain error or not, I'm just trying to figure out how do we treat the rifle when, as Mr. Chaudhary pointed out, the evidence says that he was confronted. I'm not quite sure what that means, and so- I'm very glad you asked that question. So the only evidence in the record, and it was crystal clear at both the hearing and at the trial through the testimony of Arantia and Mandoli, is as follows. And then you confront him, and this is at ER 46 to 53 to start, and you confront him with a firearm. You present it to him. They bring up the firearm from the bedroom. So what does that mean? Arantia, and this is just crystal clear notwithstanding the repeated erroneous implication in the opening and reply briefs in this case. Arantia is sitting with the defendant on the couch with the son, who by the way had come home and was free to move around, which by the way distinguishes this case from Kim, where the court emphasized the isolation of the woman who couldn't speak English very well from her husband who was forced to wait outside for three hours. And she was also told to shut up when she was speaking with her son in another language. How old was the son? In this case? Yeah. He was in his late teens. So he comes home. He's free to move around, and the three people in the living room are Arantia, the agent, the son, and the defendant. And he says, it's clear at ER 46 to 53, and then it's clear again, the court itself, by the way, inquired at this point at the hearing. And then again, it's clear at trial, at ER 383, where Arantia says, I was in the living room, and then the defendant, seeing other officers removing a rifle from his mattress, from inside his own mattress, goes like this, shakes his head, and says, it's all over. And the testimony said that it was not in response to any question. He was simply saying it as an aside to himself. The paradigmatic excited utterance, it's all over. Why? Because officers found an assault rifle hidden in his mattress, and he knew he was a felon in possession at that point. So that is, so why under the law? So making clear that the facts show that this was a spontaneous statement, not in response to any question. My colleague's argument is primarily as follows. Given that he was in custody, and that at prior points he had been asked questions, that it would be reasonable for the officers to understand that the minute they found the contraband, that he would say something. Well, first of all, that's just not what the law is. And so why is that? Because take, for example. Well, the law says it doesn't have to be a question. It can be an action, a police action. And so the question, I think, for you today is whether or not that was a sufficient police action to bring in the rifle. And knowing that he's a felon, that that would elicit a response. Right, so it simply can't be that a police officer finding contraband is then tagged with asking a question under the case law for purposes of an excited utterance? Have him in a room, and they go and they pull the rifle out and then present it to him. And I'm not saying, I'm not decided, so these are just the questions that come up in light of these facts that are here. So to be clear, there's a difference between being presented with something. In other words, hey, look what I found in your room just now. Versus, they just find the thing and he's looking nervously, as Officer Stearns testified in this case. The defendant is nervously looking into the room like this, saying, what are they doing in there? He then sees the gun and says, it's all over. So that, it wasn't a presentation as much as he has a sight line into the room and he makes the excited utterance. But let's look at the case law. So in this, you have a person in the backseat of a cop car and the officers say to one another in the classic phony ruse, frankly. Wouldn't it be a shame if some kids found this shotgun and shot themselves? And then the defendant in the backseat of the cop car says, I'll tell you where the gun is. Let's look at Schettelbauer versus Estelle in this court. The classic prisoner's dilemma. The defendant is brought to the jail. He's questioned intensely. Okay, he refuses to make certain inculpatory statements. Then the officers say, and they lie, and this is clear from that case. They lie and they say, you know, your other cronies, they already ratted you out. He then makes the inculpatory statement and this court holds that that statement was spontaneous. We have Hernandez against Holland. Someone similarly says something while in a jail cell in court to the bailiff. The bailiff testifies. So in all of these cases, there's much more custody and overwhelming of the defendant, and the court found that they were all, held that they were all spontaneous statements. In this last minute that I'm going to give you, do you want to address harmless error? Yes. First by once again pointing out that that's not the relevant standard here. Given the extensive forfeiture at all relevant points, this is a plain error case. Couldn't be more clear. Under plain error, first of all, there is no error as to custody. Second of all, even if there were an error, given Cazares, okay, and given the different facts of Craighead, and given Bassignani, it wouldn't be plain. And third, even if it were plain, it wouldn't have affected or prejudiced the defendant given all the other evidence, which I think is where your honor wants to direct me. But I mean, is it really plain error if the district court went ahead and dealt with this and made a ruling? I thought our case law said if the district court made a ruling on this, do we really look at it in plain error? Well, let's look at what Judge Klausner himself said, which is nobody pointed out this ammunition statement to me, defendant. You didn't file it in your motion. You didn't raise it when I made my ruling at the hearing. You simply said thank you as the other statement. And then you never objected timely or at all. And then you never asked for a limiting instruction. But he went ahead and took care of every scenario. It seems like in terms of addressing the law. So I'm just trying to figure out, I know you're focused on the plain error, but just help me and just assume that maybe it might not be plain error. If you don't want to address the harmless error, that's fine. I very much do. I just want to say, as the Supreme Court pointed out in Puckett, we can't have trial litigation by ambush and we need to let a district court analyze. But as to harmless error, what is the evidence in this case? It's overwhelming. You have, first of all, they never objected to the statement about the clothing being his, which is in the room. They pull out ammunition, which is a crime itself from a file cabinet where he has his old papers, financial and medical, as the court noted. Then in his own mattress, there is a slit with a hidden compartment and the firearm is removed. There's simply no question that these items, which are the body of the crime, are found in his home. And he makes a statement, which is clearly spontaneous. It's all over. You also have the testimony of Officer Stearns, who's testified that he had clear consciousness of guilt by getting very nervous and shifting around and peering as they began to look at the mattress. So you have someone caught literally red-handed in their home with ammunition among their personal effects, which is a crime, and a firearm hidden in their own mattress. He makes two inculpatory statements. So even if one is out, the other is in. Yeah, I guess I'm making myself clear. So let's just assume, arguendo, that those statements don't come in. Is there enough evidence there to show that those items would have been his? Let me make an important distinction. There's simply no question that if the it's all over statement, which, by the way, the government concedes is testimonial, but it's just spontaneous, but if that statement doesn't come in, then a new trial would be required. Because we emphasize that statement in our opening. We emphasize that statement in our closing. It's incredibly probative. It defeats the harmless error argument substantially, but we need it. Let me ask it again. Let me give you another chance. Isn't there other evidence, like his picture in the room, his medication, that would show that anything in there was his? Of course. So there is. There's the picture. There's the medicine. There's the fact that it's his house. And among all of his things, in his file cabinet and in the mattress. So yes, there's tremendous evidence of guilt. It's just the government did, independent of all the statements. Yes. Okay. Thank you very much. Let me see if Judge Gould has any other questions. None here. Thank you. Thank you. And I'll give you one minute. We've gone way over time, but I'll give you one minute. I'll do, I'll be less than a minute, Donna. I'll just address one point as to this waiver argument. I would just direct the court to ER 29 through 30, where the district judge, the district court says he understands Miranda's part of the argument on the motion to suppress. It's fully argued by both sides, and the district court makes a ruling on that at ER 64 to 65. And as we say in our brief, there's no ambiguity on the ruling. It's a ruling as to when he was in custody. The district court says he's in custody at the time he said it's over, because at that time they knew he was an ex-con with a gun in the district court's words. And in terms of this argument about, we didn't talk about the ammunition statement, et cetera, as this court knows, on a motion to suppress, it's not that the burden is on the movement to identify every single word that they're seeking to exclude. Generally, on a motion like this, you seek to say, at this point, defendant was in custody and should have been given Miranda warnings, and anything that follows after that should have been excluded. So I think it's a little bit unworkable to suggest that we must list every single word that is sought to be excluded. And in terms of the clear ruling from the district judge, and then this issue at trial, I would just refer the court to Federal Rule of Evidence 103 in Palmer, where it's very clear, I think, under this court's law, that a clear ruling by the district court is sufficient to preserve the objection. And so we do believe under Kim and Craighead, this question of custody, et cetera, is de novo review on a mixed question of fact and law. But thank you very much. Thank you. Judge Gould, do you have anything else? Nothing on this. No, thank you. Thank you. Thank you both, Mr. Chaudhry and Mr. Schleifer, for your arguments and presentations here today. The case of United States of America versus Ralph Deon Taylor.
judges: Gould, Murguia, Christensen